**Jessica Pearson, Psy.D.**
**Clinical and Forensic Psychology**
19 West 34th St. PH
New York, NY 10001
917-520-8090

March 28, 2008

Deirdre Von Dornum, Esq.
Federal Defender Division
Southern District of New York
52 Duane Street, 10th Floor
New York, NY   10007

**Re: Forensic Psychological Evaluation of Mr. Robert Quinones**

Dear Ms. Von Dornum,

At your request, I have prepared this report of my psychological evaluation of Mr. Robert Quinones. Mr. Quinones has pleaded guilty to 25 counts of Aiding in the Preparation of False Tax Returns and two counts of Filing False Claim for Refund. The charges arose out of allegations that between February 2001 and October 2005, Mr. Quinones engaged in including inflated or fabricated deductions on the income tax returns he prepared for clients. The allegations also state that in 2002 and 2003 he knowingly filed false W-2 forms from New York Hospital. In the context of these charges, you have requested that I evaluate Mr. Quinones in order to assess the following issues:

1. Does Mr. Quinones suffer from a mental illness?
2. Are there mitigating circumstances related to his mental and medical condition that impact his culpability in the instant offense?
3. What treatment would be most appropriate for Mr. Quinones at this juncture?

**I. Qualifications:**

My qualifications to render an opinion in this matter can be found in the enclosed curriculum vitae. In sum, I am a psychologist licensed to practice in the State of New York. I received my Psy.D. in Clinical Psychology from Yeshiva University in 2003. My predoctoral and postdoctoral clinical experience has included extensive experience in psychological assessment and the diagnosis of mental disorders and in conducting forensic evaluations in criminal court. Since August of 2004, I have held a position as a Senior Psychologist at Bellevue Hospital on the Forensic Psychiatry Inpatient Service for which I treat and assess forensic patients and conduct forensic evaluations of mentally ill pre-trial criminal defendants and provide expert testimony as needed. In addition, I am

the Assistant Director of Forensic Assessment and my responsibilities include conducting and supervising psychological assessment of forensic and civilian inpatients and outpatients. I also have a private practice in Manhattan in which I conduct forensic evaluations and outpatient psychotherapy. In addition, I have been an Assistant Adjunct Professor at New York University since 2004. I currently teach two courses related to forensic psychology.

## II. Sources of Information

1. Clinical interview and psychological testing with Mr. Robert Quinones on 3/12/08, 3/17/08, and 3/29/08 for a total of 5 1/2 hrs
2. Collateral phone interview with Ms. Madeleine Quinones on March 19, 2008
3. Review of Criminal Complaint
4. Review of Ms. Madeleine Quinones letter to Honorable Denise L. Cote, dated February 24, 2008
5. Review of the Pre-Sentencing Report written by Ross N. Kapitansky
6. Review of medical records from the Department of Veteran's Affairs dated 08/04/1998-05/02/02 and 11/10/03-10/16/08
7. Personality Assessment Inventory (PAI)
8. Repeatable Battery of Neuropsychological Symptoms (R-BANS)
9. Trauma Symptom Inventory (TSI)

## III. Confidentiality

Prior to beginning the evaluation, Mr. Quinones was informed of the limits of confidentiality. He was informed that the results of the evaluation would be written in a report for his attorney and potentially submitted to the court. He indicated his understanding of the limits of confidentiality.

## IV. Interview Data

*Relevant Childhood History*

Mr. Quinones was born on November 19, 1957 in New York City and was raised by his mother and father. The family lived in New York City until he was twelve years old and then the family moved to Stamford, Connecticut for approximately 3 ½ years before moving to the Bronx. He described the family as middle class and both of his parents worked. Mr. Quinones is the fourth of five siblings; growing up he had three older brothers (the oldest of whom is now deceased) and one younger sister. He denied a childhood history of physical or sexual abuse. He also denied witnessing violence between his parents but noted that other family members had said that his father had been violent with his mother in the past. He denied a family history of mental illness, criminal history, or substance abuse.

Mr. Quinones' father died in 1978 from a stroke. His oldest brother, Michael, died in 1985 from an HIV-related illness. His mother died shortly after, in 1991, from a stroke. He indicated that he was very close with his mother and her death has been a significant factor in his depression. He currently has no contact with his two older brothers and has had only sporadic contact with his sister who lives in Georgia.

Mr. Quinones stated that he dropped out of Roosevelt high school during the 12th grade but obtained his GED. He noted that he was "great in history, math and science," but "not so good in spelling." He denied a history of special education classes and stated he was never expelled or suspended from school. He could recall only one physical altercation he had throughout his schooling and that was with a good friend, and was resolved quickly. He denied any history of gang involvement. In 1972, when he was 16 years old, Mr. Quinones enlisted in the Navy. He stated that he had lost two cousins and several friends in the Vietnam War and wanted to serve his country. He got his mother to allow him to sign up prior to his 17th birthday. He was in the Navy for one and a half years; two to three months in basic training and then he lived in a camp in Great Lakes, Illinois until he was honorably discharged. His father had a heart attack and his mother requested that he return home to assist her.

Since his discharge from the Navy, Mr. Quinones has had steady employment and has obtained further education. *It should be noted that Mr. Quinones had significant difficulty recalling dates and providing a timeline of his job history. Therefore some information was also obtained from the pre-sentencing report.* According to Mr. Quinones, he worked in retail and marketing for many years until he began working for the Transit Authority around 1984. He then worked for Cablevision for approximately two to three years. He then worked for the Board of Education as a paraprofessional for several years. After that, he began working in security, both for Slomin's and for ADT. ADT was his last employment prior to starting his own company, Uncle Sam's Nephew. He had been preparing taxes seasonally while still working at ADT but began his business fulltime in 2001. He stated that he worked with a partner, Mr. Reyes, until 2004, and then he worked alone. In 2003, Mr. Quinones obtained his Bachelor of Science in Business Administration from University of Phoenix, an online university.

*Relevant Social History*

Mr. Quinones is currently married and has two adult sons. His oldest son, Robbie, is 24 years old, lives in Orlando, Florida, and does marketing for Sears. His youngest son, Brandon, is 21 years old and is attending Bergen Community College. His wife, Madeline Quinones, is employed full time by the Board of Education. Mr. Quinones noted that he was married once before, in 1978. He and his first wife divorced in 1981 but had separated prior because the relationship "didn't work." He married his current wife, Madeline, in 1985 and he referred to her as his "soul mate." Mr. Quinones indicated that he does not have any friends and does not keep in touch with his siblings anymore. He stated that he cut off contact with his best friend, Robert Rosario, many years ago because of shame related to his drug use (see Psychiatric and Substance Abuse history). Mrs. Quinones noted that he has not engaged in social activities or received enjoyment

from social events for many years. She believed the death of his mother and his later drug use led to his isolation and depression.

Mr. Quinones denied a history of prior arrests.

*Medical History*

Mr. Quinones denied any major medical problems as a child. While in the Navy, during a combat exercise, he was hit in the mouth with the back of a bayonet. He stated he had a brief loss of consciousness and had to have his teeth wired. He remained in the hospital for a couple of days. He noted that the incident was an accident but did not elaborate. Mr. Quinones also reported that he damaged his right knee in high school and he tore a ligament in his left knee in 2005 while moving boxes. He is currently supposed to have surgery on both of his knees but because he has to drive his wife to and from work (she does not know how to drive), he has put off the surgeries. He noted significant pain in both knees and according to the VA records has been taking prescription opiates for pain management. He has been taking Oxycontin since 2006 for knee pain as prescribed by Dr. Van Hook, his General Practitioner. Mr. Quinones has been on Methadone 110 mg for several years, which has also caused him some medical issues. He has gained approximately 75 pounds since starting on it and he stated his teeth have loosened and one has fallen out.

*Psychiatric and Substance Use History*

Mr. Quinones denied any contact with a mental health professional until he was in his late 30s. He noted that he saw a therapist on the Upper East Side of Manhattan for a couple of sessions. That clinician referred him to a rehab program and then he stopped going. He also reported seeing a therapist in Teaneck, New Jersey for a brief period of time but stopped going because of "time commitments." He is currently seeing a psychiatrist, Dr. Goa, who was his son's psychiatrist. At the writing of this report, Mr. Quinones had seen him twice and had been started on Welbutrin (an antidepressant) and Lunesta (for insomnia) but he has stopped taking the Lunesta because of the cost. He also noted that he hoped to start weekly psychotherapy with Dr. Goa in addition to medication management.

Mr. Quinones stated that he smoked marijuana in high school but has not used it since. He reported drinking alcohol occasionally but usually only has a beer at social occasions. He stated that he began using Oxycontin (a prescription painkiller) when he was 38 years old. He obtained the drugs from one of his brother's friends who was a pharmacist. He stated that he initially used it because of knee pain but then developed tolerance and addiction. He used Oxycontin for approximately two years until starting heroin. Mr. Quinones noted that he began using heroin while working at Slomins because other employees were using and it was accessible. At the worst point, he reported using $150 worth a day or 15 bags.

Although the timeline is not completely clear, Mr. Quinones reported that he sought out treatment for his drug use several times but did not commit until going to the VA. (The only records available are from the program he is currently in at the VA.) He attended a group therapy for substance abuse in Englewood, New Jersey but only went once because he felt "shame." He then tried a 28 day rehabilitation program in Lafayette, New Jersey but was asked to leave after two or three days because of a conflict with the social worker. Mr. Quinones attempted another 28-day rehabilitation program in Carmel, New York, with an acquaintance, and when the acquaintance left after three days, Mr. Quinones followed. After leaving the program in Carmel, he stated that he signed himself into a 7-day detoxification program at St. Barnabas. This occurred around 1996. No other attempts at treatment were mentioned until he entered the VA program. From August 4, 1998 until May 2, 2002, Mr. Quinones attended the Department of Veteran Affairs, Opiate Substitution Program. He stated he was treated with LAAM (Levo-alpha-acetylmethadol) also known as LAM, a synthetic opiate used as a replacement therapy for heroin addiction. He stated that he left the program in 2002 to try and "kick the habit" on his own; however, the records indicate that he was noncompliant with the program, continuing to use opiates in addition to the LAM. On April 13, 2002, he provided a "cold urine" to the staff and was informed he would have to taper off the LAM or find a new Methadone Maintenance Treatment Program. He left the program in May 2002 and did not enter another program but stated that he began using heroin. He reentered the VA program in 2003. At that time, the program started him on a Methadone Maintenance program and he was going three to five times per week to receive Methadone 110mg. He had several brief periods of relapse with positive urine toxicologies but also had lengthy periods of abstinence. However, near the end of 2005, he began to have positive results again and he informed the team that he was taking his wife's prescription of Tylenol #3 with codeine for knee pain. He also went to his doctor and obtained a prescription for narcotics for knee pain. Therefore, he continued to have positive urines until the last record reviewed on October 17, 2007. He noted that he now attends the program four days per week to receive the Methadone because of his legal case. As part of his treatment at the VA, he meets with a clinical social worker monthly. According to the records, he denied any psychiatric problems until January 4, 2007. He stated that he was offered a referral to see the psychiatrist for depression but he did not follow through. The VA records note that Mr. Quinones called the program on August 16, 2007, the day before he was arrested, and informed them that he had relapsed and requested a 28 day rehabilitation program. However, he did not go because of his arrest.

**V. Current Mental Status/ Behavioral Observations**

Mr. Quinones is a 50-year-old married, domiciled, obese, recently unemployed Hispanic man of Puerto Rican descent. He appeared his stated age, was well groomed and wore glasses and casual clothing to the evaluations. He was alert and oriented throughout the course of the evaluation. He was polite and cooperative with all aspects of the assessment process. Noteworthy throughout the assessment process was Mr. Quinones' difficulty in remembering sequences of events, details, and dates. His descriptions of events in his life were not linear and he required assistance in creating a linear sequence. Mrs. Quinones

confirmed that she had noticed memory and attentional difficulties over the last several years with a worsening of symptoms after his arrest.

Mr. Quinones appeared nervous and anxious at times during the interview, wringing his hands, tapping his fingers on his legs, and bouncing his leg. His speech was soft and deliberate. His thought process was tangential at times and he required redirection to answer the specific question asked. Thought content was significant for depressive content. No delusions or paranoia were elicited. He denied ever experiencing psychotic symptoms including auditory and visual hallucinations but he did endorse having some beliefs, such as believing in spirits, which he stated were related to his cultural upbringing. He noted that he had a guardian angel who saved him from being hit by a car as a child. He also stated that he heard "sounds" in his house and believed that it may be haunted. He endorsed past and present passive suicidal ideation but denied ever having the intent to harm himself. He noted that two weeks after starting his current medication, the thought of cutting his wrists in the bathtub came to him, but he stated his belief that suicide was selfish. He also noted that he believed he was "getting better." He reported engaging in self-injurious behavior by peeling the skin off his feet (Mrs. Quinones confirmed) to the extent that he caused bleeding and sores that make it difficult to walk. He has been engaging in this behavior for several years. Mr. Quinones stated his mood has been depressed for a significant period of time. He reported neurovegetative symptoms of depression (Mrs. Quinones confirmed) including decreased motivation, poor sleep, nightmares, loss of interest in activities, no interest in sexual activity, forgetfulness, and poor attention and concentration. His affect during the interview was consistent with his stated mood.

As noted above, some cognitive difficulties were noted including poor memory for autobiographical details and poor attention and concentration. Therefore, a neuropsychological measure was administered (see Cognitive Testing). His judgment seemed adequate although Mrs. Quinones noted that he had become more impulsive and was not thinking things through before making a decision. His insight into his problems was less adequate. Although he was aware of his depression and substance abuse problem, he seemed to have limited understanding as to how to help himself or the severity of his substance use. He continued to minimize his use during the evaluation.

## VI. Testing Results

*Personality Testing*

Mr. Quinones was asked to complete two self-report measures, the Personality Assessment Inventory (PAI) and the Trauma Symptom Inventory (TSI). The PAI is a measure that asks about a variety of psychological problems that clinical and non-clinical populations experience, and also has validity scales to determine response style (i.e. is the person minimizing or exaggerating psychological problems). Mr. Quinones provided a valid protocol and there was no indication that he was attempting to portray himself in a less than forthcoming manner. He did provide some idiosyncratic responses to particular items, which were later explored and clarified. Overall, Mr. Quinones presented on the

test as he did in person, as an individual with a serious substance abuse problem and significant depression. Likely stemming from the depression and substance abuse, he also appears pessimistic about his future and has significant guilt and rumination about his life. As reported in the clinical interview, he endorsed symptoms of depression including sadness, loss of pleasure, lost of interest in activities, sleep disturbance, social isolation and loss of appetite. Also noteworthy was his report of concerns about his physical functioning. Lastly, he presented with some level of disorganization in his thought process, difficulty with concentration and distractibility, and this was also observed during the evaluation.

Mr. Quinones also endorsed some anxiety and traumatic stress and therefore the TSI was administered. The TSI is a self-report measure of posttraumatic stress and other symptoms associated with traumatic events. His profile was valid and interpretable. There were significant elevations on several scales assessing anxiety and depressive symptoms. Specifically, Mr. Quinones endorsed physiological symptoms of anxiety, like feeling tense and easily startled. He noted depressed mood and depressive cognitions often associated with pessimism, isolation, and suicidality. In addition, he endorsed distractibility, feeling detached and removed from himself, feeling emotionally numb, and absent minded. This profile does not indicate a diagnosis of Posttraumatic stress disorder but provides further evidence of his depressive disorder. Again, this profile was consistent with the PAI and the behavioral observations during the clinical interview.

*Cognitive Testing*

Based on Mr. Quinones' presentation during the evaluation and reports from his wife regarding his functioning, the Repeatable Battery of Neuropsychological Status (RBANS) was administered to screen for neuropsychological impairment. The measure assesses the following areas of neuropsychological functioning: immediate memory; visuospatial/ constructional ability; language; attention; and delayed memory. The most significant finding for Mr. Quinones is his delayed memory. The rest of his scores are in the Average or Low Average range. However, his delayed memory fell in the 10th percentile for men of his age, which is markedly lower than his, other scores. There are likely two factors at work in his delayed memory being lower than his other abilities: depression and substance abuse. And these two factors have also likely depressed his other scores, despite them being in the Average and Low Average ranges. He is currently taking Methadone 110 mg per day. Methadone has multiple side effects and it is unclear at this time which side effects Mr. Quinones is experiencing because of his co-morbid depression. Methadone can affect thinking and reaction time; it can cause anxiety and restlessness; it can impair sleep and cause insomnia; and it can decrease sex drive. All of these symptoms can and do occur with depression as well. And most of these symptoms can impact someone's ability to concentrate and attend to tasks. Mr. Quinones' behavior during the evaluation was consistent with his performance on the test. He had the most difficulty with long-term memory and attention. It should be noted that his scores are not in the Impaired range compared to other individuals in their 50s, but they do indicate difficulties for him.

## VII. Account of the Events Leading to Arrest and Understanding of the Current Legal Charges

As with the historical information mentioned above, it was also difficult to obtain a linear account from Mr. Quinones of the circumstances leading up to his arrest. He does have a clear understanding of the current charges against him and the potential legal consequences of those charges but has significant difficulty expressing what happened in a logical, linear sequence. He stated that he pled guilty and he takes "responsibility for what happened because it was my number (e-file account)." The majority of these charges stem from "inflating numbers to obtain the client a refund." He explained that he met his partner, Mr. Reyes, while working at H & R Block around 1999 and Mr. Reyes referred him clients during tax season once Mr. Quinones left H & R Block. Mr. Quinones stated that Mr. Reyes offered to help him obtain his CPA and recommended that Mr. Quinones join the e-file program; they became partners. He stated that after two years, "I picked up where Reyes left off," for 2003 and 2004. Prior, Mr. Reyes would bring him declarations to sign and Mr. Quinones would sign them without going over them because he trusted him. He later found out that Mr. Reyes was not a certified CPA and the IRS has been unable to locate him.

Mr. Quinones also explained the last two counts he is charged with, Filing False Claim for Refund. He stated that he never worked for New York Hospital but that taxes were filed as if he worked there for two years. He assumed that Mr. Reyes filed the taxes. He stated that the refunds went directly into the business account and that the two men were "50-50" financial partners. He noted that everything was in his name and Mr. Reyes would draw 50% of the profits directly from the accounts. Mr. Quinones stated that he was not keeping track of the accounts because he was working full time elsewhere and he would just withdraw necessary monies from the accounts for his mortgage. He also accepted responsibility for this as everything was under his name and he should have been aware of what was occurring in his business.

## VIII. Diagnosis

Mr. Quinones' history and presentation, as well as the data available from a review of the records, indicate that he meets criteria for the following diagnoses according to the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV)*:

| | |
|---|---|
| Axis I | Dysthymic Disorder |
| | Rule out Substance Induced Mood Disorder |
| | Rule out Major Depressive Disorder |
| | Opiate Dependence, on Agonist Therapy |
| Axis II | Deferred |
| Axis III | Torn ligament in knee |
| Axis IV | Problems with legal system; occupational difficulties; impairment in social relationships |
| Axis V | 55-60 |

Case 1:07-cr-00544-DLC    Document 15-8    Filed 04/11/2008    Page 9 of 11
Robert Quinones, 03/28/08 page 9

## IX. Diagnostic and Forensic Formulation

Mr. Quinones is a 50-year-old married, domiciled, recently unemployed Hispanic man who has pled guilty to federal charges related to submitting fraudulent tax returns. He was assessed at the request of his attorney, Ms. Deirdre Von Dornum, Esq., to evaluate his psychological functioning and to address any mitigating circumstances related to the instant offense. Based on the psychological testing, behavioral observations, and collateral information, Mr. Quinones suffers from Dysthymic Disorder (chronic depressed mood), and opiate dependence. The severity of his mood disorder appears greater than a Dysthymic Disorder; however, it is not possible to say whether this stems from a Substance Induced Mood Disorder or Major Depressive Disorder because of his long standing opiate dependence. Therefore, the "rule out" provision is provided to each diagnosis in order to indicate what should be evaluated in the future. Once Mr. Quinones is abstinent from any opiates for several months, a clinician will be able to evaluate whether his depressive symptoms were substance induced. Although the etiology is unclear, he does meet criteria for Major Depressive Disorder and his symptoms appear to have worsened with the stress of his current legal circumstances.

Mr. Quinones suffered several significant losses in his twenties and thirties. His father died at a young age when Mr. Quinones was only 19 years old. His oldest brother died of an HIV related illness in 1985 and the most significant loss was in 1991, when his mother died of a stroke. Mr. Quinones was 34 years old. According to Mr. and Mrs. Quinones, the siblings began to drift apart. It was soon after that Mr. Quinones, age 38, who had not abused drugs or alcohol in the past, began obtaining prescription opiates from a pharmacist. As he noted during the evaluation, the loss of his mother was exceptionally difficult for him as they were very close. It is likely that he began using opiates to self medicate both physical and psychological pain. He began using heroin approximately two years later as it was easier to obtain than prescription opiates; this began his decade long intranasal heroin use. Whether there was depression present before using opiates is unclear but a depressive disorder developed with the use of opiates. His wife noted a progressive decline in his mood and interest in life that she equated with his drug use. This persisted throughout his 40s and progressively worsened over time. The recent stress of his legal case has exacerbated his depression further.

In reviewing Mr. Quinones' records from the VA and his multiple attempts at treatment, it may be difficult to feel sympathy for him because he often manipulated, and ultimately failed each time. People who have not faced addiction have little understanding of the complete loss of control the addict experiences. He describes events in his life, such as "being introduced to heroin," as if they were out of his control and he was a passive object. For example, he often rejected treatment for medical problems and psychiatric intervention when it was clearly needed unless it was forced upon him by the treatment program. He believed he was someone unable to effect change or maintain control over his own life, and helpless and hopeless that he could do anything differently. It is likely that his depression and substance use developed conjointly and fed each other. The more drugs he used, the more depressed he felt; the more depressed he felt, the more he needed

to self medicate. And to attempt and fail treatment was a reinforcement of his helplessness and lack of control.

There is another side to Mr. Quinones, one which his wife described in her letter to the judge in his legal case. This letter described an exceptionally generous and giving man who sacrificed for his family growing up and continued to work equally hard for his wife and children. He has always persisted in employment, sometimes having multiple jobs to be able to provide a nice home for his family. He achieved further education as an adult to better himself and his family. He is a man who drives his wife to and from work everyday and left the military, a goal he wished to pursue as a young man, to assist his mother despite having three older brothers who were living close to home. It is difficult to reconcile the drug abusing man who lied about his use and the generous sacrificing family man, but they are both aspects of Mr. Quinones. And what makes him remarkable and offers hope for his ability to succeed is that he was able to retain the positive side even when his addiction was at its worst.

### X. Mitigating Circumstances and Relation to the Offense

Mr. Quinones' severe substance abuse, depressive disorder, and passive stance led him to be vulnerable to manipulation. Throughout the period during which these offenses took place, Mr. Quinones was in and out of treatment, but was always using additional opiates, beyond what he was given in treatment. Therefore, his insight and judgment were impaired from the drugs as well as from the depression. He was making choices and decisions which were clearly not in his or his family's best interests, from discontinuing treatment and hiding his problems from his family, to engaging in negligence and impulsive behavior in his work, which led to fraudulent practices.

It is clear that Mr. Quinones has experienced a tremendous amount of guilt and shame from his drug abuse. It is likely that he became very used to avoiding and denying the truth of the deterioration of his personal life. It isn't difficult to see how this could also translate from his personal life to his professional life. Given an opportunity to expand his career and own a business, a huge sense of accomplishment, he took it, all the while denying the facts and avoiding any investigation into who was giving him this opportunity and how it was being obtained.

### XII. Treatment Recommendations

Mr. Quinones desperately needs substance abuse treatment and intensive psychotherapy. His explanation for why he has failed treatment and continued to use prescription opiates is his knee pain. He avoided seeing a medical doctor until he injured this other knee in 2005 and finally sought evaluation and treatment in 2006. Prior, he medicated himself, and now he receives a prescription for another opiate, in addition to Methadone. It is his belief that once he has the surgery, he will detox from the Oxycontin and the Methadone. And this is a plausible goal, but not without extensive treatment and support. He has wonderful support from his wife, but he requires programmatic support in a mandated treatment setting with strict enforcement of rules and structure. He has refused self-help

or group programming for substance use in the past but this should be a requirement of his treatment as it will provide additional needed support and not allow him to avoid all social interaction and confrontation. He would benefit from a long term program which would transition from inpatient to outpatient. In addition, he would benefit from continued long term individual psychotherapy and pharmacological treatment for depression, which he has begun. Without treatment for depression, he is at considerable risk for relapse.

An additional significant factor in Mr. Quinones' mental health is his ability to support his family. If he were to be incarcerated and unable to provide for them financially, it would severely impact his psychological functioning and worsen his depression. Prison settings do not provide the kind of treatment that Mr. Quinones requires in order to effectively treat both his depression and substance abuse. He may receive medication but he will not have the opportunity to work through the significant issues which have prevented him from succeeding in substance abuse treatment in the past.

I hope that this report has been of some help to you. If I can be of any further assistance in this matter, please do not hesitate to contact me.

Sincerely,

Jessica Pearson, Psy.D.
Licensed Clinical Psychologist