UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - -
                          x

UNITED STATES OF AMERICA      :
                          :
        - v. -          :
                          :      SENTENCING MEMORANDUM
ROBERT M. QUINONES         :
                          :      07 Cr. 544 (DLC)
         Defendant.     :
                          :- - - - - - - - - - - - - -
                          :
                          x



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 17, 2008

*BY ELECTRONIC FILING AND HAND DELIVERY*

Hon. Denise L. Cote
U.S. District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street, Room 1040
New York, NY 10007-1312
(212) 805-5053

      Re: United States v. Robert M. Quinones (07 Cr. 544 (DLC))

Dear Judge Cote:

      This letter sets forth 1) the government's position with regard to the facts relevant to Robert Quinones's sentencing; 2) the government's Sentencing Guidelines analysis; and 3) the government's sentencing recommendation.

## I.    INTRODUCTION

      The defendant, Robert Quinones, knowingly and intentionally prepared false income tax returns for clients. The defendant filed numerous false tax returns during the 2001, 2002, 2003, 2004 and 2005 tax years, and caused a loss of approximately $470,000 to the United States Government. Additionally, for the 2002 and 2003 tax years, the defendant filed false claims for refund based on fabricated Forms W-2 that caused the IRS to issue him approximately $19,700 in refunds to which he was not entitled. In order to deter the defendant and other would-be false tax return preparers, and in order to promote respect for this country's tax laws, the government recommends a sentence of incarceration within the range of 30 to 37 months, along with a fine and restitution.

      The United States Court of Appeals for the Second Circuit has set forth the required sentencing considerations in the wake of United States v. Booker, 543 U.S. 220 (2005). After the Booker decision, which held that the United States Sentencing Guidelines ("USSG") are advisory, a sentencing judge must first analyze the Sentencing Guidelines, giving both parties an opportunity to argue for whatever sentence may be appropriate. The sentencing judge should then consider all of the sentencing factors set forth in 18 U.S.C. § 3553(a) to determine whether they support a sentence

-1-

requested by either party.  See United States v. Cutler, 2008 WL 706633, at *18 (U.S. March 17, 2008)(citing Gall v. United States, __ U.S. __, 128 S.Ct. 586, 596 (2007).

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors, which support a within-guideline sentence in this case.

## II.    BACKGROUND

On June 14, 2007, an indictment was returned by a federal grand jury charging Robert Quionones with twenty-five counts of aiding and assisting in the preparation of false and fraudulent tax returns in violation of 26 U.S.C. § 7206(2) and two counts of filing false claims for refund in violation of 18 U.S.C. § 287.  On December 21, 2007, Quinones entered pleas of guilty to all of the charges contained in the indictment.  There is no plea agreement between the government and Quinones.  Sentencing is presently scheduled for March 28, 2008.

## III.   STATEMENT OF FACTS

Robert Quinones owned and operated Uncle Sam's Nephew, a tax return preparation business located on Pearsall Avenue in the Bronx from some time in 2001 through some time in 2004.  At some point before the filing deadline for tax year 2004, Quinones renamed the business Exact Accounting Services.  Exact Accounting Services was located at the same address and was in the business of preparing income tax returns for clients until at least some time in 2005.  As the owner and operator of these businesses, Quinones prepared federal and state income tax returns for clients and accepted payments for his services at that location.  As a tax professional, at all relevant time periods, Quinones was well aware of the requirements of the tax laws.

From 2001 through at least 2005, Quinones engaged in a pattern of including greatly inflated or fabricated deductions on the income tax returns he prepared for his clients.  The indictment focuses on seven clients.  These seven clients are not related and do not know each other, yet each described a similar experience in dealing with Quinones.  Each of these seven clients met personally with Quinones to have their income tax returns prepared.  The clients provided Quinones with any tax forms they had received, such as Forms W-2.  Quinones did not ask for any information related to deductions that the clients may have been entitled to claim on their income tax returns, such as charitable contributions and unreimbursed employment-related expenses.  None of these seven clients provided Quinones with any information related to any such deductions.  Quinones fabricated deductions in similar categories and in similar amounts and included them on Schedules A that he prepared in connection with these clients' income tax returns.  When Quinones provided these clients with copies of their income tax returns for their records, he omitted the Schedules A that contained the fabricated deductions.  The inclusion of the false deductions on the income tax returns of these seven clients, as described in the indictment, led to a loss of approximately $95,000 to the IRS.

When confronted by IRS Special Agents, Quinones stated that an individual named Orlando Reyes had prepared some of the returns in question and filed them using Quinones's electronic filing identification number.  Each of the seven clients covered by the indictment identified Quinones as

the only male employee of Uncle Sam's Nephew and Exact Accounting Services.

During the investigation, one of the seven clients described in the indictment indicated that Quinones asked him to tell IRS Special Agents that Reyes had prepared his return, when, in fact, Quinones had prepared that return. Quinones even gave that client a physical description of Reyes to give to IRS Special Agents. The client reported that he had never met Reyes, and to his knowledge, Reyes had not prepared any of his income tax returns. In a subsequent interview, this client modified this account, stating that when asked what the investigation was about, Quinones indicated that Reyes had prepared the client's returns, but did not ask him to provide this information to IRS Special Agents.[1]

Quinones filed personal income tax returns for tax years 2002 and 2003. These returns were prepared and filed in the Bronx, New York. Each of those returns included a Form W-2 that purported to report wages and withholdings from New York Hospital. Based on the amounts of wages and withholdings reported on the Forms W-2 from New York Hospital, Quinones claimed that he was entitled to a refund from the IRS. During the Rule 11 hearing in this case, and again in his Sentencing Memorandum, Quinones claimed that an individual named Orlando Reyes, who mysteriously disappeared as soon as the defendant learned that he was under criminal investigation, is responsible for the falsification of these Forms W-2 and the filing of the corresponding false

---

[1] USSG §3C1.1 provides that "If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by levels." Application note 4 sets forth a "non-exhaustive list of examples of the types of conduct to which this adjustment applies," including (a) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." The Court of Appeals for the Second Circuit has upheld the District Court's imposition of the "obstruction of justice" enhancement where a defendant instructed a witness to provide false information to investigators. See, e.g., U.S. v. Feliz, 286 F.3d 118, 119-21 (2d Cir. 2002); U.S. v. White, 240 F.3d 127, 138 (2d Cir. 2001).

In the present case, the facts arguably do not support the application of an enhancement under USSG §3C1.1. First, the witness's statements are arguably ambiguous, and this ambiguity would arguably prevent the government from establishing Quinones's statements by a preponderance of the evidence. If the client's second statement is credited, and the evidence shows that Quinones simply gave the witness a false exculpatory statement regarding who prepared his returns, it is not clear that Quinones intended to obstruct justice. Without this requisite showing of willfulness, this enhancement is not applicable. See United States v. Woodard, 239 F.3d 159-162-63 (2d Cir. 2001).

Since it is arguable that the government's evidence justifies the application of USSG §3C1.1, the government makes no argument in favor of a two level enhancement here, but presents these facts for consideration by the Probation Office and the Court.

claims for refund. It is worth noting that the only source of income reported on these falsified income tax returns was New York Hospital. The claim that the defendant, a professional tax return preparer, would not notice that this return included income from a hospital where he had never worked, while omitting any mention of the business that he owned and operated, strains credulity. There is no credible evidence to suggest that an individual named Orlando Reyes was involved with the defendant's false claims for refund that induced the IRS to issue Quinones tax refunds totaling approximately $19,700.

## IV.    SENTENCING GUIDELINES COMPUTATION

Initially, it must be determined which Guidelines Manual is to be applied in calculating Quinones's sentencing range. Generally, the guidelines in effect at the time of sentencing should be used, unless their application results in a potentially harsher sentence, in which case the guidelines in effect at the time of the offense should be applied. See United States Sentencing Commission, Guidelines Manual, §1B1.11 (Nov. 2001). The most recent offense for which Quinones was convicted occurred in 2005. There have been no substantive changes to the guidelines manual that are relevant to the instant offenses of conviction since 2001; therefore, the applicable guidelines manual is the Guidelines Manual of November 1, 2007, the manual that will be in effect at the time of sentencing.

### A.    Base Offense Level

The base offense level for Quinones is determined by referencing the Guidelines section applicable to the offenses of conviction. Here, Quinones was convicted of offenses under separate code sections. Pursuant to §3D1.2(d), the charges contained in counts one through twenty-seven of the indictment are grouped into a single group. Pursuant to §3D1.3(b), the offense level of that group is the offense level corresponding to the aggregated quantity for all counts, using the offense guideline that produces the highest offense level. Here, the guideline that produces the highest offense level is §2T1.4, the guidelines section applicable to counts one through twenty-five, aiding or assisting the preparation of materially false tax returns. The base offense level under §2T1.4 is the level determined by applying §2T4.1 (Tax Table) to the tax loss. Tax loss is the total amount of loss that is the object of the offense. USSG §2T1.1(c). The base offense level for these offenses correlates to the total "tax loss" caused by the defendant's conduct for which he was convicted and all relevant conduct, as defined in §1B1.3.

The government is required to prove all facts pertaining to sentencing by a preponderance of the evidence. See United States v. Salazar, 489 F.3d 555, 557 (2d Cir. 2007). Where the tax loss is uncertain, courts are permitted to make a reasonable estimate of the loss based on the facts available. See USSG §2T1.1 comment. (n.1). A district court's tax loss calculation is reviewed for clear error. See United States v. Gomez, 31 F.3d 28, 31 (2d Cir.1993).

### 1.    Calculations for Offenses of Conviction

Section 2T1.1 defines "tax loss" as "the amount of tax that the taxpayer owed and did not pay."

-4-

Guidelines section 2T1.1(c)(2) provides that the tax loss shall be 20 percent of the gross income, "unless a more accurate determination of the tax loss can be made." The defendant bears the burden of proving mitigating sentencing factors. See United States v. Dale, 991 F.2d 819, 856 (D.C. Cir. 1993). With respect to counts one through twenty-five of the indictment, after speaking to the seven clients reflected in the indictment, the IRS prepared new income tax returns on their behalf reflecting only the deductions that these taxpayers were entitled to claim on their income tax returns. The corrected returns were then compared with those prepared for these seven clients by Quinones. Based upon this comparison, an accurate determination can be made that Quinones's conduct for counts one through twenty-five of the indictment resulted in a tax loss of $86,783. With respect to counts twenty-six and twenty-seven, Quinones received tax refunds to which he was not entitled. The loss for those counts is simply the amount of the fraudulently obtained refunds, $19,794. Thus, the total loss based upon Quinones's offenses of conviction is $106,577.

## 2.    Relevant Conduct

The guidelines specifically instruct the court to consider relevant conduct in determining the total tax loss for sentencing purposes. "In determining the total tax loss attributable to the offense (see §1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan, unless the evidence demonstrates that the conduct is clearly unrelated." USSG §2T1.1, comment. (n. 2). Under §1B1.3 it is appropriate for the court to consider even uncharged conduct which is part of the same course of conduct or common scheme or plan as the offense of conviction as relevant conduct for purposes of determining the defendant's offense level. See U.S. v. Watts, 519 U.S. 148, 156-57 (1997); U.S. v. Cordoba-Murgas, 233 F.3d 704, 708 (2d Cir. 2000); United States v. Pierce, 17 F.3d 146, 150 (6th Cir. 1994) ("For sentencing purposes the use of tax loss resulting from uncharged conduct is authorized by § 1B1.3, the 'relevant conduct' provision of the Guidelines"); United States v. Harvey, 996 F.2d 919, 921-22 (7th Cir. 1993) (including loss resulting from uncharged false tax return, noting that "[t]ax offenses, like embezzlements and drug crimes, fall within the rule that relevant conduct includes the whole scheme"). Tax harm from relevant conduct is included if the government can show by a preponderance of the evidence that the conduct was committed by the defendant and the conduct was part of the same course of conduct or common scheme or plan. See USSG § 1B1.3(a)(2).

Moreover, the Sentencing Guidelines specifically recognize that, as with loss associated with other fraudulent conduct, "[i]n some instances, such as when indirect methods of proof are used, the amount of the tax loss may be uncertain." USSG § 2T1.1, Application Note 1. A sentencing court is permitted to make "a reasonable estimate based on the available facts' where the exact amount of tax loss may be uncertain." United States v. Bryant, 128 F.3d 74, 76 (2d Cir. 1997)). In Bryant, the defendant, a tax return preparer, was convicted of aiding and assisting in the falsification of 22 income tax returns. In calculating the tax loss for guidelines purposes the sentencing court considered $4,461,633 due on 1,683 returns prepared by the defendant which had been audited by the IRS, and found to claim the same types of false deductions as the returns for which the defendant had been convicted. The sentencing court found further that Bryant's offense had generated an additional estimated loss of $600,000 based on an extremely conservative extrapolation of a tax loss of $100 per return for the some 6000 unaudited returns which Bryant had prepared. The Second Circuit concluded that the sentencing court's extrapolation was not unreasonable and upheld the court's finding that the loss caused by Bryant's frauds totaled "at least" $5,115,203. Bryant, 128

F.3d at 75.

In addition to the seven taxpayers referenced in the indictment, the IRS's investigation into Quinones's scheme included two other clients, who were interviewed by IRS special agents. These two additional taxpayers had returns prepared by Quinones in the same manner as the seven individuals referenced in the indictment. Quinones included false Schedule A deductions similar to those described by the indictment. As with the other taxpayers, the IRS prepared corrected income tax returns for these two individuals. The tax loss associated with the returns that Quinones prepared for these two additional clients is $10,561.

Lastly, the IRS performed correspondence audits on hundreds of other returns that Quinones prepared for clients during the relevant time period. The IRS was able to target Quinones's returns by using his unique electronic filer identification number. Once these returns were targeted, the IRS sent correspondence to the taxpayers questioning the validity of the deductions on their income tax returns. In connection with 191 of the audits, the clients agreed that they were not entitled to the claimed deductions. The IRS determined that the tax loss caused by the false deductions on these 191 returns was $352,905.

### B.    Base Offense Level Calculation

The total federal tax loss, including relevant conduct, is $470,043. A tax loss of more than $400,000 but less than $1,000,000 corresponds to an offense level twenty. USSG §2T4.1.

### C.    Enhancement for Being in the Tax Return Preparation Business

Pursuant to USSG §§ 2T1.4(b)(1)(A) and (B), the offense level is increased by two levels because the defendant committed the offense as part of a pattern or scheme from which he derived a substantial portion of his income, and the defendant was in the business of preparing or assisting in the preparation of tax returns. The defendant's offense level is therefore raised to twenty-two.

### D.    Acceptance of Responsibility

Pursuant to USSG §3E1.1(b), a 2-level reduction is warranted based upon the defendant's acceptance of responsibility. Furthermore, an additional 1-level reduction is warranted, pursuant to USSG § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. The defendant's offense level is therefore reduced to nineteen.

### E.    Criminal History

There is no evidence of a criminal history for Robert Quinones, so his criminal history category would be I.

### F.    Supervised Release

As Quinones was convicted of a Class D felony, the maximum term of supervised release following imprisonment is three years. 18 U.S.C. § 3583(b); see also USSG §5D1.2(a)(2) (calling for a term of supervised release of at least 2 years, but not more than 3 years). The government will recommend a three year term of supervised release for the defendant.

In addition to the standard conditions of release, the government will request that Quinones cooperate with the IRS by filing accurate tax returns from 2002 up through completion of their supervised release period and otherwise cooperate with the IRS in determining his tax liability for those years.

### G.    Restitution and Fine

The Court must order restitution pursuant to Sections 3663, 3663A and 3664 of Title 18, United States Code. The government will recommend that the Court order joint and several liability with his clients for restitution in the amount of $470,043 pursuant to those code sections. This number represents the tax loss caused by Quinones's conduct. This amount will be reduced by any payments made to the IRS by Quinones's clients.

The government will also recommend imposition of a fine within the guidelines range. For an offense level of 22, the Sentencing Guidelines authorizes a fine of between $6,000 and $60,000. USSG §5E1.2(c).

## IV.    CONSIDERATION OF THE 3553(A) FACTORS

The defendant engaged in serious offenses. He engaged in the preparation of false income tax returns for clients over a multiple year period. Further, he falsified Forms W-2 that supported his false claims for refunds. His crime falls squarely within the class of cases to which the applicable guidelines are addressed, and thus in consideration of the nature of the offense, § 3553(a)(1), counsels in favor of a sentence that falls within the range suggested by the sentencing guidelines.

It is clear that the recommended term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2). Since this country's tax collection system is based on voluntary compliance, the need to promote respect for the law is of primary importance. The recommended sentence of incarceration affords adequate deterrence to others who would commit a similar offense. Id. Further, a guideline sentence would deter the defendant, who continues to claim that another individual was primarily responsible for the commission of the crimes to which he has pled guilty, from committing similar crimes in the future. A probationary sentence, on the other hand, would send an undesirable message; that the profit one can gain by committing tax crimes is worth the risk of getting caught and receiving probation.

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D ). The Court can certainly order the defendant to comply

with mental health or drug treatment during any period of supervised release that will follow his incarceration. Further, while the Court should order the payment of $470,043 in restitution to the IRS as a condition of supervised release, this is not an issue that would militate against a period of incarceration in this case. § 3553(a)(7).

While there are many 3553(a) factors that would be addressed by the imposition of a period of incarceration within the range recommended by the guidelines, the defendant has not set forth any persuasive argument for leniency. In his sentencing memorandum, the defendant argues that his drug use and depression led him to commit the conduct underlying the indictment because he was "extremely vulnerable to manipulation." Defendant's Sentencing Memorandum, p.10. This argument is premised on the notion that Orlando Reyes manipulated the defendant by preparing the false tax returns in question, and convincing the defendant to sign and file them. As pointed out above, there is no credible evidence that suggests that anyone other than Robert Quinones played a role in these offenses. To the contrary, all of the evidence shows that the defendant met with clients, the defendant prepared the tax returns and the defendant collected the tax preparation fees and the fraudulently obtained tax refunds. Thus, his vulnerability played no part in the commission of these offenses. The fact that the defendant was voluntarily abusing illegal drugs and was depressed during the time when he committed these offenses does not weigh in favor of leniency.

Therefore, in sum, all of the appropriate considerations of sentencing favor the imposition in this case of a within-guideline sentence.

## A.    The Continued Importance of the Sentencing Guidelines

The government's recommendation of a within-guideline sentence is based in part on the fact that such a sentence properly reflects the accumulated wisdom and expertise of the Sentencing Commission, and serves the vital goal of uniformity and fairness in sentencing. While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," Kimbrough v. United States, 2007 WL 4292040, at *5 (U.S. Dec. 10, 2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" id. at *14 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).

Thus, the Supreme Court recently stated: "We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." Kimbrough, 2007 WL 4292040, at *14 (quoting Rita v. United States, 127 S. Ct. 2456, 2465 (2007)).

In Rita, the Supreme Court held that an appellate court may presume that a within-guideline sentence is reasonable. While this presumption does not apply before the district court, Rita, 127 S. Ct. at 2465, the Supreme Court's observation is informative that "the presumption reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, both the sentencing judge and the Sentencing Commission will have reached the same conclusion as to the proper sentence in the particular case. That double determination significantly increases the likelihood that the sentence is a reasonable one." Id. at 2463.

Further, the advisory guidelines are the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. This concept is widely recognized in other circuits. As the Third Circuit explained:

> Even under the current advisory system, district courts must "meaningfully consider" § 3553(a)(4), i.e., "the applicable category of offense . . . as set forth in the guidelines." The section of Booker that makes the Guidelines advisory explains that "the remaining system, while not the system Congress enacted, nonetheless continue[s] to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary." Booker, 543 U.S. at 264-65. The Guidelines remain at the center of this effort to "avoid excessive sentencing disparities," and, as the Booker Court explained, the Sentencing Commission will continue "to promote uniformity in the sentencing process" through the Guidelines. Id. at 263. We have likewise observed that the "'Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.'" Cooper, 437 F.3d at 331 (quoting United States v. Mykytiuk, 415 F.3d 606, 608 (7th Cir. 2005)).

United States v. Ricks, 494 F.3d 394, 400 (3d Cir. 2007). Therefore, the Supreme Court has held that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." Gall, 2007 WL 4292116, at *7 n.6.

The Supreme Court's recent decisions in Gall and Kimbrough do not change this analysis. As is evident from the quotations above, these cases reaffirmed the importance of consideration of the guidelines by district courts, along with all other 3553(a) considerations. Gall was actually focused on the scope of appellate review: the Supreme Court held that appellate courts must review sentences deferentially, under an abuse of discretion standard, whether such sentences are within or outside the advisory ranges. While this ruling may result in more frequent affirmance of district court decisions, it does not relieve the district courts of their primary responsibility, as explained in the Supreme Court decisions, to properly assess and consider all sentencing factors, including the advisory guideline range, and to give careful consideration to that range.

Thus, the Gall Court instructed:

> It is also clear that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications. For even though the Guidelines are advisory rather than mandatory, they are, as we pointed out in Rita, the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions.

Gall, 2007 WL 4292116, at *6.[2]

Likewise, the Court's decision in Kimbrough, issued on the same day as Gall, emphasized the district courts' responsibility to consider the Sentencing Guidelines as a bulwark against disparate sentencing.  In Kimbrough, the Court held that the guidelines for crack cocaine offenses are advisory, and that a sentencing court in such a case may consider, among other factors, the criticism stated by the Sentencing Commission and others of those particular guidelines.  Responding to an assertion that such case-by-case assessment of the propriety of the guidelines may lead to significant disparity in sentencing, the Court emphasized the district courts' responsibility to avoid that result:

> Section 3553(a)(6) directs district courts to consider the need to avoid unwarranted disparities — along with other § 3553(a) factors — when imposing sentences.  See Gall, ante . . . .

Kimbrough, 2007 WL 4292040, at *13 (emphasis in original).  Needless to say, fidelity to the guidelines is the only available means of carrying out this mandate.

Further, Kimbrough did not encourage wholesale abandonment of guideline sentencing.  To the contrary, Kimbrough narrowly focused on sentencing for crack cocaine offenses.  With respect to those offenses alone, the Court suggested that the guidelines are not entitled to the ordinary respect given to the Sentencing Guidelines on the basis of the care and study put into them, given that the Sentencing Commission itself has condemned its own guidelines in this area.  Regarding any other offenses, the Supreme Court suggested that rejection of the suggested guidelines based only on an individual judge's disagreement with the formulation of the guidelines may not fare well on appeal, stating:  "while the Guidelines are no longer binding, closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range 'fails properly to reflect §3553(a) considerations' even in a mine-run case."  Id. at *14 (quoting Rita, 127 S. Ct. at 2465).  These statements reflect the fact that, ordinarily, the Sentencing Guidelines reflect the distillation of national sentencing experience and provide a useful measure for determining appropriate and consistent punishments.

For all of these reasons, the advisory guideline range deserves significant respect.  To be clear, the government recognizes that the guidelines are entirely advisory, and that a district court has discretion to vary from an advisory range, subject only to deferential appellate review for reasonableness.  However, our point is that a district court must consider the guideline range, see § 3553(a)(4), and is usually well advised to follow the Sentencing Commission's advice, in order to assure fair, proportionate, and uniform sentencing of criminal offenders.  Moreover, as explained in detail earlier, there are no other 3553(a) factors in this particular case which militate against imposition of a sentence within that range; to the contrary, the 3553(a) factors on balance support the imposition of the recommended guideline punishment.

---

[2] The Court added:  "If [the judge] decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.  We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one."  Id. at *7.

Accordingly, the government respectfully recommends a sentence within the range of thirty to thirty-seven months' imprisonment, a fine within the range recommended by the sentencing guidelines, and restitution in the amount of $470,043.

## V.    SENTENCING RECOMMENDATION

Based on a calculated total offense level of nineteen, the government recommends a sentence within the guidelines range of thirty to thirty-seven months incarceration. Moreover, the government recommends imposition of a fine between $6,000 and $60,000. Following the period of incarceration, the government recommends a period of supervised release of three years. In addition to the standard conditions of release, the government will request that Quinones cooperate with the IRS by filing accurate tax returns from 2002 up through completion of his supervised release period and cooperate with the IRS in determining his tax liability for those years. Finally, the government will request that the Court order joint and severable liability for restitution in the amount of $470,043.

Very Truly Yours,

MICHAEL J. GARCIA
United States Attorney,
Southern District of New York

By:    _s/Michael P. Ben'Ary_____
Michael P. Ben'Ary
Trial Attorney

cc:    *via Electronic Filing and E-mail*
Deirdre von Dornum, Esq.
Assistant Defender
Federal Defenders of New York, Inc.
52 Duane Street
10th Floor
New York, New York 10007
Deirdre_VonDornum@fd.org